IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RHONDA MINTER GUARDIAN AD
LITEM FOR ISAIAH MINTER, et al.,

        Plaintiffs,

    v.

CITY OF SAN PABLO, et al.,

        Defendants.

Case No.: C12-2905 JSC

**ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT (Dkt. No. 65)**

In this civil rights case arising out of an officer's use of deadly force, Defendants City of San Pablo ("City") and Officer Mark Galios ("Officer Galios" or "Galios") move for summary judgment. (Dkt. No. 65.)  Having carefully considered the record in this case, and having had the benefit of oral argument on December 19, 2013, the Court DENIES the motion.  Drawing all reasonable inferences in Plaintiffs' favor, there is a genuine issue as to whether the decedent pointed a gun at Officer Galios.

SUMMARY JUDGMENT EVIDENCE

On January 18, 2011, Officer Galios, a sworn peace officer of the San Pablo Police Department since 2003, was on patrol in his marked police car.  With Galios was a "ride-along" named Nicolas Ayles, who was "friends" with Galios.  (*See* Dkt. No. 79 at 7:23-8:2.)  At around 8:12 p.m. Galios saw a black Acura being driven without an operable license plate light and initiated a

United States District Court
Northern District of California

traffic stop.  The driver of the Acura then pulled into a gas station, and Galios parked behind it along the gas pumps and in front of the gas station kiosk.

The decedent, Akinlabi Minter, a 33-year-old African American male on parole, was the front-seat passenger in the Acura.  Galios approached the driver, Eulah Mitchell, informed her about the reason for the stop and requested identification information.  Galios also asked for identification information from Minter as well as from a third passenger in the backseat, Jason Seymour.  All three individuals complied, but Minter's proffered information was an illegible photocopy of an identification card.  Minter verbally told Galios that his name was "Seku Sanders."  Galios noticed that Minter had a black backpack sitting on his lap.

Galios walked to the rear bumper area of his police vehicle to call in the identities of the Acura passengers for a records check to determine whether any of them had outstanding warrants.  As Galios was running the records check, Mitchell and Minter got out of the car and told Galios that they needed to use the restroom.  Galios ordered them back inside the vehicle.  Galios noticed that Minter was holding the black backpack in front of his waist as he was standing next to the Acura.  Galios states in his summary judgment declaration that "[t]his was suspicious as it was not a typical way someone would hold a backpack and it appeared to [him] that Minter was attempting to conceal something behind the backpack in the area of his waistband, perhaps a bulge of some type of weapon like a firearm." (Dkt. No. 67-1, Ex. F ¶ 16.)

As Galios started to approach the Acura, Minter fled southbound, away from Galios, around the back of the gas station kiosk.  Galios gave chase and notified dispatch that he was in foot pursuit.  Minter "quickly" discarded his backpack and continued to flee.  (*Id.* at ¶ 19.)  Galios attests that "[a]s soon as Minter discarded the backpack, both of Minter's hands immediately went towards his front waistband area."  (*Id.*)  As he chased Minter, Galios continued to yell "Stop, police!  Stop, police." (*Id.* at ¶ 20.)  Minter continued holding both hands at his waistband area.  Galios "believed that Minter likely had a firearm in his waistband area and it did not appear to me that Minter was accessing his waistband area so he could toss or discard the firearm as he maintained both of his hands in his waistband area as he fled."  (*Id.* at ¶ 23.)

United States District Court

Northern District of California

1   The pursuit continued northbound from behind the kiosk to some hedges in the parking lot in

2   between the kiosk and the sidewalk.  As Minter attempted to jump over the hedges, Galios fired his

3   taser.  Although Minter fell to the ground, it appeared to Galios "that the firing of the Taser device at

4   Minter did not have any effect on Minter whatsoever."  (*Id.* at ¶ 25.)  Galios then jumped over the

5   hedges and, as Minter was getting up from the ground with both of his hands still in his waistband

6   area, Galios used his flashlight as an "impact weapon" to strike Minter one time on the left shoulder.

7   (*Id.* at ¶ 29.)  This caused Minter to fall back down towards the ground "while he continued to

8   actively dig into his waistband area with both of his hands."  (*Id.*)

9   Back at the patrol car, Ayles, the ride-along, had lost sight of Minter and Galios as they ran

10  around the back of the kiosk, but he picked up sight of them once they were on the ground after they

11  had gone over the hedge.  (Dkt. No. 79 at 22:14-16, 82:11-13.)  Ayles testified to Galios' and Minter's

12  body positions while on the ground:

13  Q. How could you tell he was on the ground?

14  A. I saw Officer Galios on top of him.

15  Q. Okay. Now when you say on top of him, obviously people have different
16  interpretations of that.

17  A. Uh-huh.

18  Q. Can you describe in more detail what you saw in terms of body positions how you
19  would describe Officer Galios on top of him?

20  A. I would say it was in a position to gain the upper hand to control the suspect.

21  Q. So was Officer Galios from your vantage point in physical contact with the
22  suspect?

23  A. Yeah, from what I could see, I don't know if he was—if he was on, you know, on
24  his shoulder, or what, but it looked like he was on his back, on the suspect's back.

25  Q. So did -- from your vantage point did it look like the suspect's head was lower than
26  Officer Galios's head?

27  A. Yes.

28  . . .

3

Q. And could you tell how Officer Galios had -- you know, where his hands were located when the suspect and Officer Galios were in close proximity on the ground?

A. No, it was hard to tell.

Q. Could you see where the suspect's hands were at that point in time?

A. No.

Q. You couldn't tell from your vantage point; correct?

A. Correct.

Q. Would portions of the suspect's body and portions of Officer Galios's body be blocked from your view based upon the bushes?

A. Yes.

Q. So the bushes were in between you and where this interaction was occurring between Officer Galios and the suspect?

A. Correct.

(*Id.* at 82:20-83:14, 87:21-88:14.)  Ayles was sitting in the passenger seat of the patrol car 30 to 40 feet from the confrontation on the ground, with part of his body outside of the car.  (*See id.* at 88:15-24 ("I'd say 30 feet. . . . I mean 30 feet to 40 feet . . . ."), 21:18-20 ("The best way to put it is the vehicles were facing east, I had a foot in, a foot out, with my door open, so I'm facing this way kind of sitting out of the car.").)  Although it was nighttime, Ayles testified that there was some lighting from the kiosk.  (*Id.* at 24:9-11 ("[T]here was some lighting in that area, not a lot.").)  Ayles saw Galios "on the suspect" for a "short amount of time."  (*Id.* at 24:18-19.)

Galios declares that after he struck Minter with the flashlight, causing Minter to fall to the ground, Galios then "reached down and put Minter into a bear hug type grabbing position to try to control Minter with my hands and body.  At that point, I was behind Minter and Minter's back was touching my chest and we were both on our knees."  (Dkt. No. 67-1, Ex. F ¶ 30.)  During the course of this "bear hug type maneuver," Galios "put his hands on top of Minter's hands around Minter's waistband, over Minter's clothing, as both of Minter's hands were still inside of Minter's waistband."  (*Id.* at ¶ 31.)  Galios then "instantly felt a heavy and solid object in Minter's waistband that [he] believed, based upon [his] training and experience, was likely a firearm."  (*Id.* at ¶ 32.)  Galios reached for his department firearm with his right hand, and started ordering Minter "several times" to "stop what you are doing" and "I don't want to have to shoot you."  (*Id.* at ¶¶ 34-35.)

4

Minter did not respond to the orders "and seemed extremely motivated to access his firearm and continue his resistance."

Galios then pulled his firearm from his holster while he started to get to his feet and pointed it at Minter's back.  Galios continued to order Minter "several times" to stop what he was doing or he was going to shoot him.  (*Id.* at ¶ 38.)  At approximately the same time, Minter stood up and Galios and Minter were "in close proximity to each other."  (*Id.* at ¶ 39.)  Galios held his gun at his waist area towards Minter's back in a "retained position"—close to his hip and pointed slightly upwards at Minter's upper body, as opposed to his arm being extended straight out in front of him in a typical shooting stance position.  (*Id.* at ¶ 40.)

According to Galios, "[a]s Minter got erect onto his feet, Minter immediately then turned towards his left and I then saw Minter pointing a silver firearm over Minter's left shoulder, with the gun in Minter's right hand, and it was pointed towards me as I was directly behind Minter and in close proximity."  (*Id.* at ¶ 41.)  Galios was "within about a foot of Minter" and used his left hand to attempt to push Minter's silver firearm away from Galios' body.  (*Id.* at ¶ 43.)  Galios could feel Minter using pressure to try to continue pointing the gun towards his body.

Galios repelled Minter's firearm away and then started to fire his gun in the retained position at Minter's body.  "After [Galios] started firing [his] weapon, Minter spun to his right and started to run away from [Galios]."  (*Id.* at ¶ 45.)  Believing Minter still possessed the silver firearm, Galios "raised up [his] arm from the retained position by [his] hip to a more straight out, arm extended, typical shooting position as [he] continued to shoot at Minter as he ran away from [Galios]."  (*Id.* at ¶ 47.)

"Shortly thereafter," Minter fell to the ground and Galios stopped firing.  (*Id.* at ¶ 50.)  Galios then saw the silver firearm on the ground within "several feet" of Minter's body.  Galios "immediately" informed dispatch that shots were fired and requested an ambulance for Minter.  (*Id.* at ¶ 54.)  Galios also checked Minter's vital signs to see if he had a pulse.

According to Defendants' crime scene analyst, Alexander Jason, Galios fired seven shots, with four hitting Minter, over the course of 2.25 seconds.  (Dkt. No. 67-3, Ex. R.)  Mr. Jason also testified that the first wound—Wound B—was inflicted by Galios' first gunshot, which was fired from a

distance of three to six inches, measured from pistol muzzle to body.  (*See id.* at ¶ 10(c).)  Based on the similarity between the horizontal trajectory of Wound B and Wound C, Mr. Jason testified that Galios' second shot caused Wound C.  While Mr. Jason testified that Wound B and C have different vertical trajectories—B is upwards, while C is flat—he said this "could be consistent" with the pistol being fired first from a lower location and then from a higher location, "which is consistent with Officer Galios' description of the decedent's movement that he fired the first shot from a low position near his waist and then raised the pistol to his shoulder level for the subsequent shots."  (*Id.* at ¶ 10(b).)

Returning back to Ayles—the only other witness on this record to have seen the events in question[1]—his testimony regarding what he saw following the struggle on the ground is inconsistent. Near the beginning of his deposition, under questioning by Plaintiffs' counsel, Ayles testified as follows:

> A. I saw Officer Galios on the suspect for a short amount of time,then I put my attention back to the occupants inside the vehicle.
>
> Q. Okay. And when Officer Galios and the suspect were down for approximately -- did you see them eventually get up, get up from the ground?
>
> A. I did not see them get up until I heard the shots fired.

(Dkt. No. 79 at 24:18-25.)

> Q. Did you tell the officers that you saw Officer--when you were being interviewed do you remember telling the officers interviewing you that you saw Officer Galios and the suspect get up?
>
> A. Um, no, I have to say no.
>
> Q. Regardless of what you remember or don't remember telling them did you see the suspect get up?
>
> A. I saw him up because when the shots were fired I saw him go down.

(*Id.* at 27:22-28:5.)

> Q. When you saw Officer Galios standing was he holding a gun or not?

---

[1]  Plaintiffs' opposition to the motion contends that, in addition to Ayles, a Lee Myers witnessed the events; however, beyond this reference to Myers in Plaintiffs' briefing, Myers' account of the incident is found nowhere in the record.

United States District Court
Northern District of California

A. I saw Officer Galios and the suspect when there had already been I think it was three or four rounds fired, because my attention was on the occupants in the vehicle, I looked to my right, because they were at the left, I looked to my right, I saw Officer Galios, he had his gun and he fired a few rounds and that's when I saw the suspect go down.

Q. Okay. Did you tell any investigators that you saw the suspect get up and he started running away and that was when Officer Galios pulled his gun out and fired the shots? Did you make that statement to any officer?

 [objection]

A. Basically how it went down from what I remember and what I saw is I saw Officer Galios up, this was literally split second right when he had fired his firearm, Officer Galios is up, the gun was at the hip, he had a couple rounds go off that drew my attention to the right, I saw the suspect take a final step and then go down.

(*Id.* at 29:15-30:13.)

Plaintiffs' counsel continued to question Ayles regarding whether he saw either of the men stand up prior to hearing any gunshots, and this time Ayles answered in the affirmative:

Q. [W]hen you saw the suspect stand up you had not yet heard any gunshots at that time; am I correct?

A. Correct.

Q. Okay. When you saw the suspect stand up and before you heard any gunshots, and you saw Officer Galios also standing up, how far was the suspect from Officer Galios?

A. I'd say anywhere from probably four to six yards.

Q. Okay. So the suspect is standing up, Officer Galios is standing up, they are about four to six yards away, and at that point you did not hear any shots; am I correct?

A. I told you before I did not see the suspect up unless he was basically running away from Officer Galios.

(*Id.* at 31:22-32:12.)

Further, after Ayles testified that he could "clearly see" Galios walking over to Minter and checking his vitals after the shooting because he "was watching after the gunfire started" (*Id.* at 34:20-35:3), Plaintiffs' counsel asked:

7

Q. Well, actually you were watching even before the gunfire started because you saw both Officer Galios and the suspect standing at least four to six yards away from you [sic] at some point; correct?

A. Correct.

[objection]

A. Okay. Basically I had seen Officer Galios and the suspect up, get up, very split second, my attention was drawn back to the vehicle, I had seen them basically standing up, then I heard the gunshots and my attention was drawn back to them, after two or three gunshots were fired my attention was back and that's when I saw the suspect go down.

(*Id.* at 35:4-23.)

Later in the deposition, under questioning by Defendants' counsel, Ayles' contradicted himself again and testified that he did *not* see either Galios or Minter stand up:

Q. So now we are at the point in time you see Officer Galios and the suspect in close proximity, if not touching, on the ground by the bushes; right?

A. Okay.

Q. I'm going to orient you to that moment in time.  What is the next thing you see with regard to the suspect and/or Officer Galios?

A. That's when I saw the suspect go down after the shots were fired.

Q. Okay. Let me back up

A. Okay.

Q. -- because it sounded like we already had the suspect on the ground.

A. He is on the ground; correct.

Q. Okay. Once you see that, Officer Galios dealing with the subject on the ground --

A. Uh-huh.

Q. -- did you then redirect your attention to the Acura vehicle?

A. Correct.

. . .

United States District Court
Northern District of California

1  Q. [H]ow long do you think you then redirected your attention at the Acura vehicle in
2  front of you before you then have some awareness that there are some shots being
   fired?

3  A. I'd say anywhere from 10 to 15 seconds.

4  Q. And that's your best estimate?

5  A. That's best estimate.

6
7  (*Id.* at 85:1-86:8.)

8  Q. When you first tum your head and you see Officer Galios and/or the suspect, let's
   just pause right there –

9  A. Uh-huh.

10 Q. -- freeze it.  My question is how was Officer Galios's position, was he on the
11 ground, was he standing up, was he hunched over, what can you recall?

12 A. He was standing up.

13 Q. Okay.

14
15 A. From what I could see he had the pistol down here rather than pointed up, that's
   when the first couple shots fired, so I saw him then after the suspect went down, he
16 brought the pistol up, and I believe he fired I think it was a total of seven, eight
   rounds, I believe, I'm not sure exactly, but after that when the suspect went down that
17 was -- that was the final shot, basically.

18 (*Id.* at 91:9-92:1.)

19 Q. So it's true, is it not, that you never saw the suspect in the act of getting from the
20 ground to his feet?

21 A. Correct.

22 Q. And when you saw him on the ground, when you next saw him he was already
23 standing up?

24 A. Correct.

25 Q. And the same with Officer Galios?

26 A. Correct.

27
28 (*Id.* at 103:9-17.)

United States District Court
Northern District of California

9

Beyond Ayles' testimony regarding whether he saw either Galios or Minter stand up, Ayles testified that, although he saw Galios' gun, he never saw Minter holding a gun or pointing a gun at Galios.  (*See Id.* at 29:9-10 ("Q. Did you see the suspect holding a gun [when he was running away from Officer Galios]?  A. No."), 31:12-14 ("Q. [D]id you ever see the suspect point a gun at Officer Gallos?  A. No.").)  Ayles further testified as to his observations of Minter's hands:

> Q. [W]hen the suspect was running away from Officer Galios where were the suspect's hands?
>
> A. I couldn't see.
>
> Q. Okay.  At any point in time did you see the suspect hiding his hands?
>
> A. No, not from where I was sitting that I could see, no.
>
> Q. When the suspect was on the ground did the suspect put his hands in his waistband?
>
> A. Not that I could see.
>
> Q. When the suspect got up from the ground did you see the suspect put his hands in his waistband?
>
> A. Not that I could see.

(*Id.* at 62:15-63:6.)

> Q. Did you ever see, other than the backpack before the suspect fled, did you ever at any point in time see anything in the suspect's hands?
>
> A. No.
>
> Q. Did you ever -- once you -- once your attention was directed back to the area where the suspect and Officer Galios were located, this is after you had seen them on the ground so now you look back and they are on their feet, did you look at the suspect's hands at that point in time during this two- to three-second time frame?
>
> A. I couldn't tell you where his hands were.
>
> Q. So, in other words-- in other words, if he had anything in his hands would you have been able to see it from your vantage point?
>
> A. Yeah, I mean I could see his body so it's possible I could have seen what was in his hands, I could have probably, yeah.

Q. But you don't have a recollection one way or the other as to whether or not he did have anything in his hands?

A. I didn't see anything, no.

Q. Well, let me clarify this because it's one thing to say you didn't see anything in his hands, it's another thing to say that you were not looking at his hands, so to speak.

A. Yeah, I mean with how quick it happened I wasn't looking particularly for what the suspect had in his hand, I was more worried as far as, okay, is that Officer, you know, Officer Galios that is making -- firing the shots, so I wasn't really - my attention wasn't drawn to possibly what the suspect could have been doing.

(*Id.* at 100:2-101:9.)

Finally, Ayles testified that, more generally, he had a "clear view" of both Galios and Minter in the two to three seconds between when Minter was on his feet and when he fell down after being shot:

Q [from Plaintiffs' counsel]. And when Officer Galios was standing there holding his gun and you saw the suspect running away from Officer Galios is it fair to say you had a clear view of Officer Galios at that time?

A. Yes.

Q. Is it a fair statement to say that when you saw the suspect running away from Officer Galios you had a clear view of the suspect at that time?

A. Yes.

. . .

Q [from Defendants' counsel]. When you were just asked about these two questions about the clear view, what did you mean by your answer in terms of the clear view of Officer Galios and the suspect?

A. I could not see facial descriptions.  I could see full body both Officer Galios and the suspect.  I could see Officer Galios's firearm.  There was enough light to see their actual body structure, not just like a silhouette I guess you would say.

Q. For those two to three seconds you see the suspect on his feet until he fell to the ground were you specifically looking at the suspect during that time, or were you looking at Officer Galios, or something else?

A. I kind of had a clear view of both of them.  I could see Officer Galios and the suspect based on where I was at, I could see both of them.

United States District Court
Northern District of California

11

1    (*Id.* at 117:19-119:2.)

2                         **SUMMARY JUDGMENT STANDARD**

3         Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

4    and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

5    any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

6    P. 56(c). "A moving party without the ultimate burden of persuasion at trial—usually, but not

7    always, a defendant—has both the initial burden of production and the ultimate burden of persuasion

8    on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210

9    F.3d 1099, 1102 (9th Cir. 2000). "[T]he moving party must either produce evidence negating an

10   essential element of the nonmoving party's claim or defense or show that the nonmoving party does

11   not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial . .

12   . and persuade the court that there is no genuine issue of material fact." *Id.*

13        If the "moving party carries its burden of production, the nonmoving party must produce

14   evidence to support its claim or defense." *Id.* at 1103. If the nonmoving party fails to do so, "the

15   moving party wins the motion for summary judgment." *Id.* "But if the nonmoving party produces

16   enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."

17   *Id.* In deciding whether there exist genuine issues of material fact, the court draws all reasonable

18   factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255

19   (1986).

20                                **DISCUSSION**

21        Plaintffs' Second Amended Complaint alleges three causes of action: 1) wrongful death, 2)

22   excessive force under 42 U.S.C. Section 1983, and 3) *Monell* liability under Section 1983. Because

23   Plaintiffs have indicated that they will dismiss their *Monell* claim, this Order addresses Defendants'

24   only remaining contention—that Plaintiffs' excessive force claim against Galios for his use of deadly

25   force is precluded by qualified immunity.

26        To prevail on a § 1983 claim, Plaintiff must show that the alleged conduct both occurred

27   "under color of state law" and deprived Plaintiff of a constitutional or federal statutory right. *S. Cal.*

28   *Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). Personal liability is established in a

§1983 action if Plaintiff shows that the official, "acting under color of state law, caused the deprivation of a federal right." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotation marks omitted).

A public official sued in an individual capacity, such as Officer Galios, can respond with a personal defense, such as qualified immunity. *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999). Under qualified immunity, government officials are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*).

To determine whether qualified immunity applies, the Court decides whether "(1) the officer's conduct violated a constitutional right; and (2) the right which was violated was clearly established at the time of the violation." *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010). The Supreme Court has instructed that district courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A right is clearly established if a reasonable officer would know that his conduct was unlawful in the situation he confronted." *Espinosa*, 598 F.3d at 532. The officer is entitled to immunity if he did not violate a constitutional right or if he violated a constitutional right that was not clearly established. *Id.*

To resolve "a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant (as viewed in the light most favorable to the plaintiff)." *Cunningham v. Gates*, 229 F.3d 1271, 1288 (9th Cir. 2000). "If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003). "Where the facts are disputed, their resolution and determinations of credibility are manifestly the province of a jury." *Wall v. County of Orange*, 364 F.3d 1107, 1110-11 (9th Cir. 2004) (internal quotation marks omitted).

United States District Court
Northern District of California

**A.      Whether Galios' use of Deadly Force Violated Minter's Constitutional Right to be Free from Excessive Force**

The test for whether force was excessive in violation of the Fourth Amendment is "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 398 (1989); *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1090 (9th Cir. 2013) ("The Fourth Amendment, which protects against excessive force in the course of an arrest, requires that we examine the objective reasonableness of a particular use of force to determine whether it was indeed excessive."). To assess objective reasonableness, the court weighs "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted).

In determining the governmental interests at stake, the court looks to the non-exhaustive list of factors in *Graham*. *See Gravelet-Blondin*, 728 F.3d at 1091. These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Beyond these factors, the Ninth Circuit instructs courts to "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotation marks omitted). This analysis allows courts to "determine objectively the amount of force that is necessary in a particular situation." *Id.* (internal quotation marks omitted); *see also Mattos v. Agarao*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) ("[I]n assessing the governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated above when additional facts are necessary to account for the totality of circumstances in a given case."). Finally, "the [Supreme] Court has emphasized that there are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must still slosh [their] way through the factbound morass of "reasonableness." Whether or not [a defendant's] actions constituted application of "deadly force," all that matters is whether [the defendant's] actions were reasonable.'" *Mattos*, 661 F.3d at 441 (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

The use of deadly force is "reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Scott v.*

14

*Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). Further, courts "must be wary of self-serving accounts by police officers when the only non-police eyewitness is dead."  *Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007); *see also Scott*, 39 F.3d at 915 ("[T]he court may not simply accept what may be a self-serving account by the police officer.").  Courts "must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably."  *Scott*, 39 F.3d at 915.  Thus, "[t]he judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts."  *Id.*

Defendants argue that qualified immunity must be granted because Galios' use of deadly force was reasonable as a matter of law given Minter's pointing of his gun at Galios following a foot chase and a struggle.[2]  The Court might be persuaded if the evidence was undisputed that Minter pointed a gun at Galios.  But it is not.  As recounted above, and again below, the testimony of Ayles, Galios' friend and the only other person in the record to have witnessed at least some of the disputed events, creates a disputed issue of fact as to whether Minter ever removed his gun or pointed it at Galios.

Specifically, Ayles testified, albeit inconsistently, that he was watching the encounter between Minter and Galios at the moment they stood up after the scuffle on the ground, before Galios fired any shots:

> Q. [W]hen you saw the suspect stand up you had not yet heard any gunshots at that time; am I correct?
>
> A. Correct.
>
> Q. Okay. When you saw the suspect stand up and before you heard any gunshots, and you saw Officer Galios also standing up, how far was the suspect from Officer Galios?
>
> A. I'd say anywhere from probably four to six yards.

---

[2]  Defendants' motion does not argue that Galios' use of deadly force was reasonable in the absence of Minter pointing a gun at Galios.

United States District Court
Northern District of California

1

2

> Q. Okay. So the suspect is standing up, Officer Galios is standing up, they are about four to six yards away, and at that point you did not hear any shots; am I correct?

3

> A. I told you before I did not see the suspect up unless he was basically running away from Officer Galios.

4

(Dkt. No. 79 at 31:22-32:12.)  Further, after Ayles testified that he could "clearly see" Galios walking

5

over to Minter and checking his vitals after the shooting because he "was watching after the gunfire

6

started" (*Id.* at 34:20-35:3), Plaintiffs' counsel asked:

7

> Q. Well, actually you were watching even before the gunfire started because you saw both Officer Galios and the suspect standing at least four to six yards away from you [sic] at some point; correct?

8

9

> A. Correct.

10

11

> [objection]

12

> A. Okay. Basically I had seen Officer Galios and the suspect up, *get up*, very split second, my attention was drawn back to the vehicle, *I had seen them basically standing up*, *then* I heard the gunshots and my attention was drawn back to them, after two or three gunshots were fired my attention was back and that's when I saw the suspect go down.

13

14

15

16

(*Id.* at 35:4-23 (emphasis added).)

17

Ayles' testimony that he saw Galios and Minter "get up" is crucial because Galios testified

18

that "[a]s Minter got erect onto his feet, Minter *immediately* then turned towards his left and I then

19

saw Minter pointing a silver firearm over Minter's left shoulder, with the gun in Minter's right hand,

20

and it was pointed towards me as I was directly behind Minter and in close proximity."  (Dkt. No. 67-

21

1, Ex. F at ¶ 41 (emphasis added).)  Yet Ayles testified that he never saw Minter point a gun at Galios.

22

(Dkt. No. 79 at 31:12-14 ("Q. [D]id you ever see the suspect point a gun at Officer Gallos?  A. No.").)

23

Nor did Ayles ever see anything in Minter's hands once he fled.  (*Id.* at 100:2-5 ("Q. Did you ever

24

see, other than the backpack before the suspect fled, did you ever at any point in time see anything in

25

the suspect's hands?  A. No.").)  Because Ayles testified that he saw Galios and Minter get up, yet did

26

not see Minter either with a gun in his hand or "immediately" turn towards his left and point a silver

27

gun over Minter's left shoulder at Galios, the Court cannot say that no reasonable jury could find that

28

Minter did not point a gun at Galios.  In other words, Ayles testified that he saw the pivotal moment

United States District Court

Northern District of California

16

United States District Court
Northern District of California

1    in this case—Galios and Minter getting up—when Galios contends that the use of deadly force

2    became reasonable because of Minter's pointing of the gun, yet Ayles testified that he did not see

3    Minter point a gun when he was getting up.  Indeed, Ayles testified that he never saw Minter with a

4    gun.

5           Further, Ayles' testimony as to the position of Galios' gun when Ayles turned his attention to

6    Galios and Minter after hearing multiple shots contradicts Defendants' crime scene analyst's report.

7    Specifically, Ayles testified that while he had his head turned forward with his attention on the

8    occupants of the Acura, he heard "two to three" (*id.* at 35:21) or "three to four" (*id.* at 29:18) shots,

9    turned his head, and saw Galios' gun "at the hip" (*id.* at 30:10-11) or "near his hip" or "around the hip

10   area . . . on his way up to bringing the gun all the way up to its full position" (*id.* at 94:11-14).  In

11   other words, Ayles testified that he saw Galios with his gun in the retained position after Galios had

12   fired anywhere from two to four shots.  However, according to Mr. Jason's report, the second shot

13   Galios fired entered Minter's body near his shoulder area on a flat vertical trajectory—Wound C—

14   which Mr. Jason concluded "is consistent with Officer Galios' description of the decedent's

15   movement that he fired the first shot from a low position near his waist and then raised the pistol *to

16   his shoulder level for the subsequent shots*."  (Dkt. No. 67-3, Ex. R ¶ 10(b) (emphasis added).)

17   Wound B, the first shot, entered Minter's body at extremely close range and on an upward trajectory,

18   *i.e.*, the bullet was shot from the retained position.  Ayles' testimony could therefore be found to be

19   inaccurate; unless Galios fired the first shot upwards from his waist, raised the gun to shoulder-level

20   for the second shot, and then lowered his gun back towards his waist for the subsequent shots before

21   raising it back up again—which is not what Galios testified to—Ayles' testimony can be construed as

22   inconsistent with Defendants' own expert report of the shooting.

23          Given Ayles' insistence that he saw Galios holding his gun near his hip as he was firing, a

24   reasonable jury could infer that Ayles' testimony about looking away from the encounter during the

25   crucial moment between when Galios and Minter stood up and Galios fired the first shot at Minter is

26   not credible.  A reasonable jury could further infer that since he saw Galios' gun at hip position he did

27   in fact see both men before shots were fired but did not see Minter with the gun.

28

17

United States District Court
Northern District of California

Finally, in light of Ayles' testimony that he did not see Minter with a gun, Galios' admission that he "misspoke" during his post-shooting protocol interview when he stated that Minter turned towards his right, rather than his left, when Minter pointed the gun at him (Dkt. No. 67-1, Ex. F at ¶ 68) is evidence that goes to whether an officer's potentially self-serving account is "internally consistent." *See Scott*, 39 F.3d at 915 ("The judge must carefully examine all the evidence in the record, such as medical reports, *contemporaneous statements by the officer* and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." (emphasis added)).

Defendants try to downplay Ayles' damaging testimony, contending that "Plaintiffs' counsel asked disjointed, confusing and vague questions of witness Ayles, during a poor chronological record of the incident facts, to try to confuse Ayles and then followed up such questions by mischaracterizing Ayles['] deposition responses to try to obtain favorable testimony." (Dkt. No. 78 at 8.)  Defendants further assert that their own counsel "was very effective at the deposition in clarifying what Ayles actually saw and recalled regarding the incident." (*Id.*)  The Court agrees with Defendants to the extent they recognize that Ayles' testimony is inconsistent on material issues in dispute in this case; however, the Court disagrees that it is allowed to choose the version of Ayles' story that is most favorable to Galios, particularly where that story is "clarified" through Defendants' counsel's use of leading questions. (*See, e.g.*, Dkt. No. 79 at 103:9-12 ("Q. So it's true, is it not, that you never saw the suspect in the act of getting from the ground to his feet?  A. Correct.").)  Rather, as the nonmoving party, all reasonable inferences must be drawn in Plaintiffs' favor.  Nor does the Court agree that the questions asked by Plaintiffs' counsel were particularly "confusing" or "vague."  As quoted above, Ayles answered the questions succinctly and without a request for clarification.  The Court does not know why Ayles' testimony is contradictory, but the record does not support Defendants' contention that the contradictions can be explained by vague and confusing questioning.  At trial, the parties will have a further opportunity to seek the truth as to what Ayles saw the night Minter was shot.  Ayles' deposition testimony, however internally inconsistent, creates a disputed issue as to whether Minter pointed a gun at Galios, thus precluding summary judgment in Galios' favor.

Defendants also contend that Ayles' testimony is ultimately unhelpful to Plaintiffs because "Ayles conceded that he could not tell whether there was anything in Minter's hands at the time of this struggle as the events happened quickly, they happened some distance away from Ayles and in a dimly lit area." (Dkt. No. 78 at 9.)  As an initial matter, Ayles' testimony as to what he did or did not see in Minter's hands went beyond Ayles' observations when Galios and Minter were on the ground; the testimony also included what was in Minter's hands after Galios began shooting at Minter. Moreover, Ayles did not "concede" that he could not tell whether there was anything in Minter's hands.  For instance, in one exchange with Defendants' counsel towards the end of the deposition, Ayles testified:

> Q. Did you ever see, other than the backpack before the suspect fled, did you ever at any point in time see anything in the suspect's hands?
>
> A. No.
>
> Q. Did you ever -- once you -- once your attention was directed back to the area where the suspect and Officer Galios were located, this is after you had seen them on the ground so now you look back and they are on their feet, did you look at the suspect's hands at that point in time during this two- to three-second time frame?
>
> A. I couldn't tell you where his hands were.
>
> Q. So, in other words-- in other words, if he had anything in his hands would you have been able to see it from your vantage point?
>
> A. Yeah, I mean I could see his body so it's possible I could have seen what was in his hands, I could have probably, yeah.
>
> Q. But you don't have a recollection one way or the other as to whether or not he did have anything in his hands?
>
> A. I didn't see anything, no.
>
> Q. Well, let me clarify this because it's one thing to say you didn't see anything in his hands, it's another thing to say that you were not looking at his hands, so to speak.
>
> A. Yeah, I mean with how quick it happened I wasn't looking particularly for what the suspect had in his hand, I was more worried as far as, okay, is that Officer, you know, Officer Galios that is making -- firing the shots, so I wasn't really - my attention wasn't drawn to possibly what the suspect could have been doing.

(*Id.* at 100:2-101:9.)  While it is true that Ayles did not unambiguously testify that he saw Minter's hands and Minter was not holding a gun, what Ayles actually conceded, taking the evidence in the light most favorable to Plaintiffs, is that "it's possible I could have seen what was in his hands, I could have probably, yeah."  (*Id.* at 100:17-19.)  Ayles' statement that he "wasn't looking particularly for what the suspect had in his hand," simply reflects that Ayles was "more worried" with what Galios was doing.  (*Id.* at 101:3-9.)

In addition, Ayles testified that he had a "clear view" of both Galios and Minter, including Minter's "*full body*," with enough light to see "their actual body structure" when Minter was "running away" from Galios.  (*Id.* at 117:24-118:20 (emphasis added).)  Defendants' counsel directly asked Ayles if he was "specifically looking at the suspect during [the two to three seconds before Minter went down], or [if he was] looking at Officer Galios, or [at] something else," and Ayles answered: "I kind of had a clear view of both of them.  I could see Officer Galios and the suspect based on where I was at, I could see both of them."  (*Id.* at 118:21-119:2.)  Thus, coupled with the testimony excerpted above, a reasonable jury could find that Ayles would have seen a gun in Minter's hand, had Minter had one in his hand, given Ayles' "clear view" of Minter's "full body."

Similarly, Defendants' contention that Ayles was too far away to see whether Minter had a gun in his hands in such a dimly lit area is undermined by Ayles' insistence that he clearly saw a gun in Galios' hand, who was only a short distance away from Minter.

Finally, that a silver gun was found within a few feet of Minter after he was killed is not dispositive.  Given the evidence described above, a reasonable jury could infer based on circumstantial evidence that the gun appeared on the ground for a reason other than because Minter pulled it out of his waistband and pointed it at Galios.

At the hearing, Defendants asserted that qualified immunity should be granted because it was lawful for Galios to use deadly force *even before* Minter pointed the gun at him.  In other words, Defendants contend that the factual dispute of whether Minter pointed a gun at Galios is not material since deadly force was reasonable even absent that fact. *See Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) (recognizing factual dispute where officer, and other witnesses, stated that officer and decedent were "grappling" with the officer's gun at the moment when the officer shot decedent, but

United States District Court
Northern District of California

1    concluding that "[t]his factual dispute is immaterial [] because either way, Detective Smith was

2    locked in hand-to-hand combat and losing" and the use of deadly force was justifiable at that point).

3    The Court is not persuaded.  The only living witness to many of the key facts that are relevant to

4    determining whether Galios' use of deadly force was reasonable absent Minter having pointed the gun

5    is Officer Galios himself.  For instance, Galios testified that he felt a heavy and solid object in

6    Minter's waistband, which he believed was likely a firearm.  As noted above, courts "must be wary of

7    self-serving accounts by police officers when the only non-police eyewitness is dead." *Long*, 511

8    F.3d at 906.  Courts "must carefully examine *all the evidence in the record*, such as medical reports,

9    *contemporaneous statements by the officer* and the available physical evidence, as well as any expert

10   testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent

11   and consistent with other known facts." *Scott*, 39 F.3d at 915 (emphasis added).  Given this directive,

12   the Court cannot deem immaterial the disputed issue of whether Minter pointed the gun and whether

13   Galios then pushed the gun away, since whether Galios' version of the story is truthful as to those

14   facts implicates his credibility in regards to other facts he also alleged occurred, such as feeling what

15   he believed to be a gun in Minter's waistband as well as seeing Minter constantly reaching in his

16   waistband with both hands.  In other words, if Galios is not believed about the pointing of the gun, a

17   reasonable jury could conclude that he should also not be believed about other aspects of the story.  In

18   *Billington*, unlike here, *all* the several non-police witnesses observed the decedent attacking the

19   officer and getting the upper hand.  *See* 292 F.3d at 1185.  Here, apart from Ayles—who testified that

20   he did not see Minter reach in his waistband—the only living witness is Galios.  The lack of

21   uninterested witnesses distinguishes this case from *Billington*. [3]

22        Also at the hearing, Defendants appeared to argue, again in the alternative, that Galios' belief

23   that Minter pointed a gun at him can be deemed a reasonable mistake of fact.  *See Torres v. City of*

24   *Madera*, 648 F.3d 1119, 1124 ("Where an officer's particular use of force is based on a mistake of

25   fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact.").

26   To the extent Defendants make this argument, the Court cannot rule, as a matter of law and drawing

27
28   [3]  The Court does not interpret Defendants' argument to suggest that the few facts that Plaintiffs agree
     happened—Minter fleeing from the scene of a routine traffic stop—alone warrant Galios' use of
     deadly force.

United States District Court
Northern District of California

1  all inferences in Plaintiffs' favor, that Galios' misperception of a gun pointed at him—which he

2  testified he pushed away—was a reasonable misperception.

3       Drawing all reasonable factual inferences in favor of Plaintiffs, there exists a genuine dispute

4  of material fact as to whether Minter pointed a gun at Galios and thus whether Galios' use of deadly

5  force was unconstitutional.  Summary judgment on Plaintiffs' excessive force claim is accordingly

6  denied.

7  **B.**     **Whether the Violated Right was Clearly Established**

8       Having determined that a reasonable trier of fact could find that Galios' use of force was

9  unconstitutional, the Court must still decide whether the constitutional right at issue was "clearly

10  established." *Saucier*, 533 U.S. at 201.  "For a constitutional right to be clearly established, its

11  contours must be sufficiently clear that a reasonable official would understand that what he is doing

12  violates that right.  This is not to say that an official action is protected by qualified immunity unless

13  the very action in question has previously been held unlawful . . . but it is to say that in the light of

14  pre-existing law, the unlawfulness must be apparent."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)

15  (internal quotation marks omitted).  The "relevant, dispositive inquiry in determining whether a right

16  is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful

17  in the situation he confronted."  *Espinosa*, 598 F.3d at 543 (internal quotation marks omitted).

18       Defendants' argument under this prong is based on their contention that there is no evidence to

19  support Plaintiffs' belief that Minter did not point a gun at Galios.  As explained above, the Court

20  concludes otherwise.  Thus, while it is indisputable that any reasonable officer would—correctly—

21  understand that use of deadly force would be reasonable if Minter pointed a gun at Galios after a

22  chase and struggle, the Court cannot conclude that the evidence conclusively shows that is what

23  happened here.  Because Defendants' qualified immunity argument depends on the question of

24  whether Minter pointed a gun at Galios—which, as explained above, is a jury question—summary

25  judgment on this claim must be denied.

26  **C.**     **Plaintiffs' Remaining Arguments**

27       Plaintiffs make several arguments that are either not necessary for resolution of the motion or

28  are not persuasive.  The Court addresses those arguments briefly below.

United States District Court
Northern District of California

1     Plaintiffs make several evidentiary objections, largely based on the contention that all

2 references to Minter's background—his parole violation, the details of his violation, his use of drugs,

3 etc.—are inadmissible since, among other things, Galios had no knowledge of these alleged facts at

4 any time during his encounter with Minter.  Although Defendants fail to respond to these objections,

5 the Court declines to rule on Plaintiffs' objections at this time given that such a ruling would not

6 change the outcome of the pending motion.  The objected-to evidence does not change the conclusion

7 that Ayles' testimony creates a disputed issue of fact as to whether Minter pointed a gun at Galios.

8     For the same reason, the Court declines to rule on whether Minter's alleged statement to

9 Mitchell regarding his "hammer" is admissible.  Even if it is, and even if Minter had a gun on him, it

10 is not dispositive of the question of whether Minter pointed his gun at Galios.

11     Turning to Plaintiffs' arguments on the merits, Plaintiffs assert that Galios made a false

12 statement when he said that he stopped the Acura because its rear license plate was not illuminated.

13 While Plaintiffs contend that an Officer C. Matecki subsequently investigated the license plate and

14 discovered that it was working, Plaintiffs offer no evidence supporting their contention.  Further,

15 Plaintiffs fail to connect the allegedly improper stop to Galios' alleged use of excessive force.  The

16 Court accordingly rejects this argument.

17     The Court also rejects Plaintiffs' contention that Galios disputes that he fired at Minter while

18 Minter was running away.  Galios plainly admits that he fired some shots as Minter was running

19 away.  (Dkt. No. 67-1, Ex. F. ¶ ("After I started firing my weapon, Minter spun to his right and started

20 to run away from me.").)  There is no factual dispute on this issue.

21     Plaintiffs further assert that, as testified to by their police expert Tim Williams, Galios' initial

22 decision to chase after Minter was a mistake and Galios should have pursued other means to

23 apprehend Minter.  Plaintiffs' argument is beside the point.  That Galios' decision to run after Minter

24 may have been contrary to police protocol does not preclude Galios' use of deadly force when he has

25 probable cause to believe that Minter poses a significant threat of death or serious physical injury.

26 *See Billington*, 292 F.3d ("[T]he fact that an officer negligently gets himself into a dangerous situation

27 will not make it unreasonable for him to use force to defend himself.").  For the reasons stated above,

28 there is a question of fact as to whether Minter actually posed a significant threat of death or serious

1   injury to Galios.  Galios' decision to chase Minter—which, if at all wrong, was at most negligent—is

2   irrelevant to that determination.

3          Finally, Plaintiffs contend that Galios' use of non-deadly force—the firing of his taser, the

4   flashlight strike to the shoulder—constitute excessive force.  To the extent Plaintiffs' claims regarding

5   Galios' use of non-deadly force exist, and are pled as separate claims, or a sub-set of claims to

6   Plaintiffs' deadly force claim, Defendants have not moved for summary judgment on those claims;

7   Defendants have moved for summary judgment on Plaintiffs' claim that Galios' use of deadly force

8   was unconstitutional.  Thus the question of whether Galios' use of *non*-deadly force was

9   constitutional is not before the Court.  The Court notes, however, that Plaintiffs' contention that the

10  use of the taser was excessive is curious given that the record shows only that the taser barbs made

11  contact with Minter's jacket, not with his body.  While a plaintiff need not show actual damage where

12  a defendant violated the plaintiff's constitutional rights in order to receive an award of nominal

13  damages, *see Wilks v. Reyes*, 5 F.3d 412, 416 (9th Cir. 1993), Plaintiffs have cited no case where a

14  plaintiff has successfully stated a similar claim despite the lack of any injury.

15                                              **CONCLUSION**

16         For the reasons stated above, Defendants' motion for summary judgment on Plaintiffs'

17  excessive force claim is DENIED.

18

19         **IT IS SO ORDERED.**

20

21  Dated:   December 27, 2013                    _____

22                                                JACQUELINE SCOTT CORLEY
                                                  UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28

                                                     24